**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

| | | |
|---|---|---|
| RICHARD TURLINGTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _1:25-cv-2782-CMC-TER |
| v. | ) | |
| | ) | |
| SAVANNAH RIVER NUCLEAR SOLUTIONS, | ) | |
| LLC, | ) | COMPLAINT FOR VIOLATION OF |
| | ) | RIGHTS UNDER TITLE VII OF |
| Defendant. | ) | THE CIVIL RIGHTS ACT OF 1964 |
| | ) | |
| | ) | ***Jury Trial Demanded*** |
| | ) | |
| | ) | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

This action involves claims for religious discrimination under Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. 2000e-2 et seq.

## I.    <u>INTRODUCTION</u>

1.     Mr. Turlington ("**Plaintiff**" or "**Mr. Turlington**") worked for Savannah River Nuclear Solutions, LLC ("**SRNS**" or "**Defendant**") as a Senior Quality Engineer at the time of his termination and involuntary, forced retirement from SRNS. At that time, he had worked at the Savannah River Nuclear site for approximately 36 years.

2.     During the COVID-19 pandemic, but prior to SRNS's COVID-19 vaccination mandate (the "**Mandate**"), Mr. Turlington was deemed an essential employee in the Quality Engineering Department and was required to travel to and through high COVID-19 breakout areas.

3.     During the pandemic, SRNS transitioned a significant portion of its workforce to virtually 100% remote work in an attempt to mitigate the spread of COVID-19.

4.     SRNS praised employees during this primarily telework phase based on their outstanding performance.

1

5. Mr. Turlington was transitioned, to a degree, to a hybrid remote work role, and continued to travel as necessary.

6. In his hybrid remote role, Mr. Turlington was able to complete many of his essential job functions from home, presented to the office when required, and continued to travel. He traveled for as long as SRNS allowed him to do so.

7. On or about September 2, 2021, SRNS's President and CEO, Stuart MacVean ("**Mr. MacVean**"), emailed all employees to advise that SRNS would impose a COVID-19 vaccination mandate as a condition of continued employment.

8. Mr. MacVean formally announced the Mandate in a September 14, 2021, email to all employees.

9. The Mandate set October 1, 2021, as the submission deadline for religious or medical exemption requests to the Mandate, and set October 15, 2021, as the deadline to receive the first dose of an available COVID-19 vaccine.

10. The Mandate specifically discussed that the reasonable accommodation given to those who had their exemption request granted would be regular testing, potentially at the employee's own expense, and possibly, adherence to other enhanced safety protocols.

11. Mr. Turlington timely submitted his religious accommodation request to the Mandate based on his devout Christian beliefs.

12. SRNS denied Mr. Turlington's religious accommodation request to the Mandate, concluding that though he articulated a religious belief in conflict with receipt of a COVID-19 vaccine, he could not be accommodated due to the supposed undue burden that accommodating him would cause SRNS.

13.     In the October 11, 2021 communication denying Mr. Turlington's religious accommodation request, SRNS specifically noted that "frequent testing in combination with the current masking and social distancing protocols is the sole reasonable accommodation," yet, asserted that it could not offer this reasonable accommodation to Mr. Turlington due to an alleged undue burden.

14.     SRNS presented Mr. Turlington with a date certain, October 16, 2021, that he would lose his site access and authorization to continue working, providing no option to continue performing his job. In other words, adverse employment action against Mr. Turlington was imminent and certain.

15.     SRNS advised Mr. Turlington that he could retire or take early retirement in lieu of being placed on a "one-year, unprotected leave of absence."

16.     After being informed that his career with SRNS was finished, Mr. Turlington was forced to take involuntary early retirement from SRNS, which he notified SRNS of on or about October 31, 2021.

17.     For all intents and purposes, SRNS terminated Mr. Turlington's employment when they denied his religious accommodation request to the COVID-19 mandate and informed him of a date certain separation. He was given no option to continue his employment with them.

18.     Said differently, SRNS attempted to coerce Mr. Turlington into violating his sincerely held religious beliefs by receiving a COVID-19 vaccine by threatening him with an indeterminate, uncertain leave of absence, which is an adverse employment action. If not a formal termination, SRNS constructively discharged Mr. Turlington because it placed him in an objectively intolerable situation sufficient to render a resignation.

19.     On belief, SRNS denied each and every one of its employees' religious accommodation requests, while simultaneously granting employees' medical exemption requests.

20.     Said differently, SRNS gave preferential treatment to those with medical, secular reasons for declining COVID-19 vaccination, but refused to accommodate a single employee whose religious beliefs precluded receipt of a COVID-19 vaccine.

21.     SRNS terminated Mr. Turlington, relying heavily on pretextual workplace safety rationales and based on a patently inauthentic undue hardship defense.

22.     The pretext of SRNS's decision is exemplified by the fact that SRNS is the only company that refused to accommodate employees with religious objections to vaccination on the Savannah River worksite. Other companies granted their employees' religious accommodation requests and allowed accommodated employees to continue working, unvaccinated, simultaneously allowing them to preserve their religious integrity.

23.     Further, SRNS terminated Mr. Turlington despite actual knowledge that those vaccinated for COVID-19 were contracting and spreading COVID-19 at similar or even higher rates than unvaccinated employees, like Mr. Turlington, which SRNS's own business records will conclusively establish.

24.     Said differently, SRNS terminated Mr. Turlington with actual knowledge that his vaccination status posed no greater health or safety threat to anyone than the threat posed by a vaccinated employee.

25.     Mr. Turlington could have continued to seamlessly perform his essential job duties exceptionally well, as he had done throughout the pandemic while unvaccinated. In other words, SRNS could have accommodated Mr. Turlington at no cost or purported risk to its workplace

through simply observing the status quo safety protocols that were already in place and that he had already been adhering to.

26.     Mr. Turlington could have been accommodated in numerous ways, including: (1) providing regular proof of a negative COVID-19 test (which Mr. Turlington was willing to do at his own expense); (2) masking; (3) recognizing the scientific reality of natural immunity against COVID-19 as an accommodation option and inquiring whether Mr. Turlington possessed antibodies to COVID-19 from prior infection; (4) allowing for a vaccinated colleague to travel to a worksite in the event that Mr. Turlington would have been required to travel to a site (i.e., voluntary schedule swapping); (5) observing other enhanced safety protocols where necessary (e.g., social distancing, masking, quarantining when symptomatic), or (6) any combination of the above.

27.     SRNS understood that a reasonable accommodation was possible, particularly, regular testing (potentially at the employee's expense) in conjunction with other enhanced safety protocols, advised its employees of same, and offered this accommodation to those with secular, medical reasons for remaining unvaccinated.

28.     SRNS did not offer any accommodation to Mr. Turlington.

29.     In short, Mr. Turlington could have been accommodated without any hardship whatsoever, and in a manner that would have created a *safer* workplace than requiring vaccination alone.

30.     Defendant, therefore, cannot show that it would have been a "substantial burden" or expense to have accommodated Mr. Turlington's religious beliefs. *See Groff v. DeJoy*, 600 U.S. 447, 470 (2023) (holding that, under Title VII, employers must accommodate their employee's

religious beliefs short of "substantial burden" or expense when viewed in light of the particular businesses' capabilities to accommodate).

31.     Defendant violated Title VII (42 U.S.C. § 2000e-2 *et. seq*) by failing to engage in a good faith interactive process to determine if a reasonable accommodation existed for Mr. Turlington, failing to provide any of the available low-cost and no-cost reasonable accommodations to Mr. Turlington, and engaging in wholesale religious discrimination by treating similarly situated, secular employees more favorably than Mr. Turlington by denying all religious accommodation requests while simultaneously granting secular, medical accommodation requests.

32.     Accordingly, Mr. Turlington seeks damages, including back pay, front pay, loss os salary increases, lost benefits, compensatory damages, damages for emotional distress, pain and suffering, punitive damages, and reasonable attorneys' fees and costs, declaratory relief, injunctive relief, as well as any other relief to which he is entitled.

## II.     <u>JURISDICTION AND VENUE</u>

33.     This court has original jurisdiction of this civil action as one arising under the laws of the United States. *See* 28 U.S.C. §1331. This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et. seq*.

34.     Venue is proper in the Court under 42 USC § 2000e-5(f)(3) because but for Defendant's unlawful actions, Mr. Turlington would have continued working in this District, the unlawful activities alleged occurred within this District, and Defendant is headquartered in this district. 42 USC § 2000e-5(f)(3).

## III.     <u>PARTIES</u>

35.     Plaintiff Richard Turlington is a resident of Georgia, residing in Martinez, Georgia.

36.     Defendant SRNS is a corporation with its principal place of business in Aiken, South Carolina. SRNS is headquartered in this district, conducts its business in this District, and the discrimination alleged occurred within this District.

### IV.     FACTUAL ALLEGATIONS

*Mr. Turlington's Employment with SRNS*

37.     Mr. Turlington worked for SRNS for many years and was a Senior Quality Engineer at the time he was terminated and forced into involuntary, early retirement with SRNS, or constructively discharged.

38.     In his role, Mr. Turlington was required to travel sparingly and did so throughout the pandemic without issue until SRNS stopped allowing him to do so.

39.     Mr. Turlington, to benefit SRNS, traveled throughout the heart of the COVID-19 pandemic while unvaccinated and did not have issues, despite traveling through areas with a high infection rate.

*SRNS's COVID-19 Vaccination Mandate*

40.     SRNS made the independent and affirmative decision to mandate COVID-19 vaccination as a condition of continued employment.

41.     On or about September 2, 2021, SRNS's President and CEO, Stuart MacVean, emailed all employees to advise that SRNS would impose a COVID-19 vaccination mandate as a condition of continued employment.

42.     On September 14, 2021, Mr. MacVean again emailed all employees to formally announce and provide details about the Mandate.

43.     In this formal COVID-19 Vaccine Mandate announcement, he noted that 78% of the SNRS workforce was already fully vaccinated or had begun the vaccination process.

44. Mr. MacVean also noted that employees were given up to four hours paid time off to get each vaccination injection.

45. The Mandate set October 1, 2021, as the submission deadline for religious or medical exemption requests to the Mandate.

46. The Mandate set October 15, 2021, as the date that SRNS employees were required to have received at least one does of the vaccine, and November 30, 2021, as the date that all employees were required to be fully vaccinated.

47. At this time, it was abundantly clear that the available COVID-19 vaccines were ineffective at preventing infection and transmission of COVID-19, as SRNS's own internal COVID-19 tracking data will reveal.

48. Because SRNS closely tracked COVID-19 infections in its workforce, SRNS had actual knowledge that vaccinated employees were still contracting and transmitting COVID-19 at similar or higher rates than unvaccinated employees.

49. SRNS admitted in its COVID-19 Vaccination FAQ that COVID-19 vaccines did not stop transmission and infection of COVID-19.

50. As early as August 2021, the Centers of Disease Control and Prevention ("**CDC**") recognized that the COVID-19 vaccines worked "with regard to severe illness and death…but what they c[ouldn't] do anymore is prevent transmission." Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021).[1] As such, federal health authorities acknowledged prior to Mr. Turlington's termination that the mandated vaccines were personal protection devices incapable of preventing infection and transmission of the virus.

---

[1] *See* Madeline Holcombe, *Fully vaccinated people who get a Covid-19 breakthrough infection can transmit the virus, CDC chief says, CNN Aug. 6, 2021,* last visited Sept. 20, 2024, available at https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

51.     During the relevant period, SRNS possessed actual and/or constructive knowledge that the mandated vaccines were neither safe, nor effective at preventing transmission and infection by any reasonable or objective measure. In fact, SRNS's records will show its vaccinated employees were contracting COVID-19 at similar or higher rates than unvaccinated religious employees, like Mr. Turlington, consistent with research from one of the world's most prestigious medical institutions-the Cleveland Clinic, which has found that the risk of contracting COVID-19 **increases** with the number of vaccine doses received.[2]

52.     Regardless of its contemporaneous knowledge that COVID-19 vaccines were ineffective at preventing the transmission and infection of COVID-19, SRNS implemented and maintained the Mandate as a condition of continued employment against employees it knew were unable to comply for religious reasons, knowing that the mandated medical procedure was at best a personal protection device, and those employees with religious objections to vaccination could have been seamlessly accommodated at little or no cost (even assuming the fiction that the mandated vaccines actually worked to prevent infection and transmission – the undergirding rationale for Mr. Turlington's termination).

53.     SRNS also knew or should have known that the mandated vaccines were not "safe" by any reasonable measure. Its business records will demonstrate the same.

54.     Despite actual and/or constructive knowledge of adverse events related to the COVID-19 vaccines readily available to SRNS after Mr. Turlington submitted his religious exemption request, SRNS required Mr. Turlington to violate his religious beliefs, justifying the

---

[2] *See* Nabin K. Shrestha et al., MedRxiv, *Effectiveness of Coronavirus Disease (COVID-19) Bivalent Vaccine*, (Dec. 19, 2022), available at https://www.medrxiv.org/content/10.1101/2022.12.17.22283625v1 (in comprehensive study, researchers found the risk "of COVID-19 increased with time since the most recent prior COVID-19 episode *and with the number of vaccine doses previously received*") (**emphasis added**) (last visited Sept. 20, 2024).

violation of his religious integrity on provably false justifications that the mandated vaccines were "safe" and "effective" and, therefore, that workplace safety demanded he discard his religious beliefs.

55. Despite clearly, admittedly stated religious reasons for declining vaccination, SRNS—in reckless disregard of Mr. Turlington's Title VII rights—insisted that Mr. Turlington abandon his beliefs in exchange for personal protection, counterfactually insisting that accommodating Mr. Turlington's beliefs would cause an undue hardship on its business.

56. Again, the mandated vaccines do not prevent transmission or infection. At best, the mandated vaccines provided an undefined level of personal protection, a benefit Mr. Turlington gladly declined to preserve his religious integrity.

***Mr. Turlington's Religious Accommodation Request***

57. As a devote Christian, Mr. Turlington holds sincere beliefs that preclude him from complying with COVID-19 vaccination.

58. Mr. Turlington submitted his religious exemption request prior to the October 1, 2021, deadline.

59. Mr. Turlington is a devout Christian.

60. Mr. Turlington believes that the use of human fetal tissue is morally wrong, believes that human life begins at conception, and that abortion is tantamount to murder. As such, it is a sin in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines. It is his understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine. With this understanding, Mr. Turlington is precluded from receiving one of the then available COVID-19 vaccines because they are the

result of the taking of an innocent human life, and to receive a COVID-19 vaccine would be a sin in his religious system of beliefs that would have eternal ramifications. With these concerns, Mr. Turlington submitted questions to SRNS regarding the vaccine ingredients and potential effects of the mRNA on the body's DNA related to his religious beliefs, with no response.

61.     Independently, Mr. Turlington relies on moral conscience and prayer when facing large and small life decisions. Mr. Turlington follows his conscience, a gift given by God. Giving way to his conscience, he made the difficult decision to forego COVID-19 vaccination and lose his career in order to listen to God's guidance because to do otherwise may invoke eternal consequences in his religious system of beliefs.

62.     Mr. Turlington believes that an individual is morally bound to obey his conscience. Mr. Turlington believes the conscience is God given and is a moral "gut check" by which God guides Christians. In his personal system of religious beliefs, undergoing a major medical procedure—like vaccination—must be voluntary and must be guided by thoughtful prayer and guidance from God because vaccination is not Biblically obligatory (there is no Biblical, authoritative teaching that requires Christians to receive any vaccine).

63.     After thoughtful prayer and reflection, his conscience was provoked not to receive a COVID-19 vaccine, and to act in conflict with his God-given conscience would be a profound violation of his religious integrity. With this understanding, Mr. Turlington is precluded from receiving any of the COVID-19 vaccines.

64.     Separately and distinctly, Mr. Turlington believes that his body is a living temple where the Spirit of God resides and indwells. He must protect this Temple, his body, which he believes is a spiritual entity. The introduction of COVID-19 vaccines to his body is not prudent

stewardship of his body and would be a sin in his religious system of beliefs because he sincerely believes it would harm him spiritually, including for the reasons outlined above.

65.     Separately and independently, Mr. Turlington believes that the God created him in his image and that he cannot alter God's design. The COVID-19 vaccines are specifically intended to alter the immune system's design. To do so would be a sin in his religious system of beliefs. With this understanding, Mr. Turlington is precluded from receiving one of the COVID-19 vaccines.

66.     After careful thought and prayer, and after application of the foregoing religious beliefs and practices to the weighty issues posed by the Mandate, Mr. Turlington came under strong spiritual conviction that he must not receive a COVID-19 vaccine.

67.     Accordingly, because of the above-described religious objections to receipt of a COVID-19 vaccine, Mr. Turlington requested a religious accommodation from the Mandate.

68.     Mr. Turlington was not willing to lose a successful career over medical concerns about vaccination; he was only willing to lose his career to preserve his religious integrity.

69.     Mr. Turlington made clear to SRNS his religious conflict with receipt of a COVID-19 vaccine, including for reasons detailed above, in his religious accommodation request.

70.     SRNS acknowledged that Mr. Turlington presented and holds religious beliefs in conflict with receipt of a COVID-19 vaccine. In other words, SRNS clearly understood it possessed a legal obligation to potentially accommodate Mr. Turlington.

71.     In fact, SRNS explicitly stated that Mr. Turlington articulated a religious belief in conflict with receipt of a COVID-19 vaccine.

72.     However, SRNS refused to engage in a good faith interactive process to identify what reasonable accommodations were available. Had SRNS operated in good faith, it would have

12

identified a variety of low-cost and no-cost accommodation options and would have accommodated Mr. Turlington, which it could have done without any meaningful hardship whatsoever.

73. Instead, SRNS summarily concluded that granting any religious accommodation request would result in undue hardship to the company (regardless of the individual employee's unique circumstances). This was despite the fact that SRNS simultaneously accommodated those with secular, medical accommodation requests to the Mandate.

***SRNS's Bad Faith Accommodations Process***

74. SRNS provided instructions on obtaining religious and medical exemptions from the Mandate. Exemption requests had to be submitted by October 1, 2021, with the relevant forms submitted to HRPolicy@srs.gov.

75. Mr. Turlington submitted a timely religious accommodation request and detailed to SRNS his sincerely held religious beliefs that precluded him from receiving a COVID-19 vaccine.

76. SRNS informed Mr. Turlington that his religious accommodation request had articulated a religious belief in conflict with receipt of a COVID-19 vaccine.

77. No HR representative, or any SRNS employee, ever spoke to Mr. Turlington about whether any reasonable accommodations were possible and failed to engage in any process to discuss his questions or an accommodation.

78. Free testing was available for Mr. Turlington during the relevant period, so regular testing was a no-cost option that Mr. Turlington would happily have abided by.

79. Moreover, Mr. Turlington was willing to cover the cost of regular testing in order to preserve his career.

80.      SRNS explicitly acknowledged, both at the time of denying Mr. Turlington's religious accommodation request and in subsequent communications with the Equal Employment Opportunity Commission that "the only reasonable accommodation" for unvaccinated employees with an approved exemption request was "frequent (twice a week) COVID-19 testing." SRNS unequivocally understood that regular testing would alleviate any concerns regarding in-person contact/appearance requirements and alleviate all workplace safety concerns.

81.      Despite this admission, regular testing was never offered to Mr. Turlington, even at his own expense.

82.      On information and belief, other attorneys contacted SRNS prior to Mr. Turlington's termination and highlighted that SRNS's actions related to the Mandate and its religious accommodation process were violating Title VII.

83.      Nonetheless, SRNS willfully disregarded Title VII's requirements and continued to insist it would not accommodate Mr. Turlington's clearly stated religious conflict with receipt of a COVID-19 vaccine.

84.      SRNS terminated and/or constructively discharged Mr. Turlington on or about October 31, 2021, the date that he was forced to take involuntary, early retirement from SRNS, by advising Mr. Turlington that it would not accommodate his sincerely held religious beliefs with respect to a prohibition on receipt of a COVID-19 vaccine and would not allow him to continue his employment with them.

85.      SRNS made the decision that it would deny all employees' religious accommodation requests addressing the Mandate even though SRNS could have easily accommodated any religious employee without imposing undue hardship on its business operations. Simultaneously, however, SRNS granted medical exemption requests to the Mandate

and accommodated certain employees with secular, medical reasons precluding receipt of a COVID-19 vaccine.

86.     SRNS treated similarly situated employees, those with secular, medical reasons precluding receipt of a COVID-19 vaccine, more favorably than religious employees who requested accommodation to the Mandate.

***Events Following Termination***

87.     On May 10, 2022, Mr. Turlington filed a Charge with the EEOC, alleging religious discrimination related to SRNS's failure to accommodate his sincerely held religious beliefs precluding receipt of a COVID-19 vaccine.

88.     On January 3, 2025, the EEOC issued an official Right to Sue notice.[3]

## V.     CAUSES OF ACTION

### COUNT ONE

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
Religious Discrimination – Failure to Accommodate**

89.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as fully set forth herein.

90.     Title VII of the Civil Rights Act of 1964, as amended in 1972, makes it unlawful for an employer to discriminate against an employee on the basis of religion. 42 U.S.C. § 2000e-2(a)(1).

91.     The statute states that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion[.]" *Id*. The term

---

[3] *See* Exhibit 1, Right to Sue Letter

"religion" as used within Title VII includes "all aspects of religious observance and practice, as well as belief." *Id*.

92. "Religion" is defined to include all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C.S. § 2000e(j). Because this definition includes a requirement that an employer "accommodate" an employee's religious expression, an employee is not limited to the disparate treatment theory to establish a discrimination claim.

93. An employee can bring suit based on the theory that the employer discriminated against them by failing to accommodate the employee's religious beliefs in conflict with an employment policy. *See Chalmers v. Tulon Co*., 101 F.3d 1012, 1014 (4th Cir. 1996).

94. To establish a *prima facie* case of failure to accommodate a religious belief, a plaintiff must show that: (1) he holds a *bona fide* religious belief that conflicts with an employment requirement; (2) he has informed the employer about the belief; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *Id*. at 1019.

95. For the reasons detailed throughout, Mr. Turlington holds sincere beliefs that preclude him from receipt of a COVID-19 vaccine and informed SRNS of same.

96. Mr. Turlington submitted his religious exemption request and outlined his religious conflict with receipt of a COVID-19 vaccine, placing SRNS on notice of its duty to accommodate him short of undue hardship.

97. Mr. Turlington is a devout Christian.

98. Mr. Turlington believes that the use of human fetal tissue is morally wrong, believes that human life begins at conception, and that abortion is tantamount to murder. As such, it is a sin

in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines. It is his understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine. With this understanding, Mr. Turlington is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life from which he can derive no benefit, and to receive a COVID-19 vaccine would be a sin in his religious system of beliefs.

99.     Independently, Mr. Turlington relies on moral conscience and prayer when facing large and small life decisions. Mr. Turlington followed his conscience, a gift given by God. Giving way to his conscience, he made the difficult decision to forego COVID-19 vaccination and lose his career of 36 years in order to listen to God's guidance because to do otherwise would invoke eternal consequences.

100.     Mr.  Turlington believes that an individual is morally bound to obey his conscience. Mr. Turlington believes the conscience is God given and is a moral "gut check" by which God guides Christians. In his personal system of religious beliefs, undergoing a major medical procedure—like vaccination—must be voluntary because vaccination is not Biblically obligatory (there is no Biblical, authoritative teaching that requires Christians to receive any vaccine). After thoughtful prayer and reflection, his conscience was provoked that he must not receive a COVID-19 vaccine, and to act in conflict with his God-given conscience in this regard would be a profound violation of his religious integrity.

101.     Separately and distinctly, Mr. Turlington believes that his body is a living temple where the Spirit of God resides and indwells. He must protect this Temple, his body, which he

believes is a spiritual entity. Mr. Turlington sincerely believes receipt of a COVID-19 vaccine would defile his spiritual body.

102.    Separately and independently, Mr. Turlington believes that the God created him in his image and that he cannot alter His design. He believes that the COVID-19 vaccines are specifically intended to alter the immune system's design. To alter God's design in this manner would be a sin, entailing eternal ramifications.

103.    Mr. Turlington's beliefs are indeed sincere, as evidenced by his willingness to uphold his beliefs while threatened with the loss of his livelihood and career.

104.    For the reasons detailed throughout, Mr. Turlington's beliefs against receiving a COVID-19 vaccine are based on his religious convictions.

105.    The "proper analysis of what constitutes a religious belief under Title VII is the same as that applied in the selective service cases." *EEOC v. Alliant Techsystems*, 1998 WL 777015, at *18-19 (W.D. Va. 1998) *(citing Welsh v. United States*, 398 U.S. 333, 26 (1970) and *United States v. Seeger*, 380 U.S. 163, 13 (1969)).

106.    "[T]he belief must only 'stem from [the person's] moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held with the strength of traditional religious convictions.'" *Id*. Citing *Welsh*, 398 U.S. at 340.

107.    "A plaintiff's religious beliefs 'need not be acceptable, logical, consistent, or comprehensible to others.'" *Id*. Citing *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 714 (1981).

108.    "The Supreme Court has made it clear that as long as a party's beliefs are religiously asserted, it is not for the courts to challenge the truthfulness of such assertions simply because they developed 'from revelation, study, upbringing, gradual evolution, or some source

that appears entirely incomprehensible.'" *Id*. Citing *Hobbie v. Unemployment Comm'n of Fla.*, 480 U.S. 136, 144 n.9 (1987).

109.    Mr. Turlington's sincerely held beliefs against vaccination are fully integrated into his comprehensive religious belief system, which guides daily decision making for matters both large and small.

110.    On October 11, 2021, Defendant denied Mr. Turlington's religious accommodation request while explicitly acknowledging that Mr. Turlington presented religious beliefs that conflicted with receipt of a COVID-19 vaccine and that reasonable accommodation, regular testing, is the "sole reasonable accommodation."

111.    Defendant did not engage in a good faith interactive process with Mr. Turlington to determine if it was possible to accommodate his articulated and sincere religious objections to receipt of a COVID-19 vaccine, and in fact, never spoke to him about potential accommodation options.

112.    Defendant never offered Mr. Turlington the option to test regularly, even at his own expense, or any other potential accommodation.

113.    The same day, on October 11, 2021, SRNS emailed the "Next Steps for Unvaccinated Employees." This email detailed dates certain for out-processing, return of site badges, and dates certain for termination if early retirement was not taken. Importantly, this email noted that "there is no plan for SRNS to drop the vaccination requirement in the future. This is a permanent requirement for SRNS and applies to our staff…regardless of telework status."

114.    SRNS took adverse employment action against Mr. Turlington when it denied his religious accommodation request and when it gave him a date certain for termination and effectively terminated his employment.

115.     Alternatively, SRNS constructively discharged Mr. Turlington because SRNS forced Mr. Turlington to make the "choice of facing discipline or complying with an employer's orders at perceived spiritual cost." *Lumley v. Town of Knightdale*, 2024 U.S. Dist. LEXIS 138790 at *11 (E.D.N.C. Aug. 6, 2024) (citing *U.S. EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144-45 (4th Cir. 2017)).

116.     "Putting an employee to the choice of facing discipline or complying with an employer's orders at perceived spiritual cost qualifies as an objectively intolerable situation sufficient to render a resignation a constructive discharge, legally equivalent to a termination." *Id*.

117.     Mr. Turlington's resignation was legally equivalent to a termination, an adverse employment action, given that SRNS put him in an objectively intolerable situation.

118.     Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant employer to show that it could not reasonably accommodate the employee without undue hardship. *Alliant Techsystems*, 1998 WL 777015, at *18-19.

119.     The Supreme Court's recent ruling in *Groff v. DeJoy* 600 U.S. 447, 470 (2023) makes clear that an "employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*.

120.     When evaluating whether an accommodation would constitute an undue burden, employers must take "into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.* Thus, "courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id.*

20

121.    Defendant is a large and sophisticated organization with considerable resources. Defendant has substantial resources and as such is able to accommodate its religious employees to a greater degree and with less burden than employers with fewer resources.

122.    Because there were multiple no-cost and low-cost accommodation options available, Defendant could have accommodated Mr. Turlington short of undue hardship.

123.    The most obvious accommodation option was regular testing, at an employee's expense, coupled with other safety protocols, which SRNS acknowledged was a reasonable accommodation.

124.    Another obvious accommodation option was telework, even if temporary until the threats associated with the pandemic subsided. Notably, Mr. Turlington had already demonstrated he was capable of teleworking while fulfilling the essential duties of his job in a hybrid remote role.

125.    There were other low-cost and no-cost accommodation options SRNS refused to consider. In the event that Mr. Turlington was required to travel on-site to perform his job, he could have seamlessly performed his job through, inter alia: (1) providing regular proof of a negative COVID-19 test (which Mr. Turlington was willing to do at his own expense); (2) masking; (3) recognizing the scientific reality of natural immunity against COVID-19 as an accommodation option and inquiring whether Mr. Turlington possessed antibodies to COVID-19 from prior infection; (4) allowing for a vaccinated colleague to travel to a worksite in the event that Mr. Turlington would have been required to travel to a site (i.e., voluntary schedule swapping); (5) observing other enhanced safety protocols where necessary (e.g., social distancing, masking, quarantining when symptomatic), or (6) any combination of the above.

126.    With any of these easily identifiable and low-cost/no-cost accommodation options, Mr. Turlington would have been able to continue performing the essential functions of his job with minimal or no burden to Defendant.

127.    Defendant refused to consider, much less provide, any of the above-referenced accommodations options for Mr. Turlington.

128.    Instead, Defendant terminated and/or constructively discharged Mr. Turlington for choosing to uphold his religious convictions.

129.    Because his sincere religious beliefs precluded Mr. Turlington from receiving one of the COVID-19 vaccines, and in light of the fact Defendant knew that the required vaccines were incapable of preventing infection and transmission (which Defendant was aware of), but would violate Mr. Turlington's sincerely held religious beliefs, Defendant's actions were in reckless disregard of Mr. Turlington's rights under Title VII.

130.    On information and belief, attorneys also reached out to Defendant in advance of Mr. Turlington's termination and detailed to Defendant that its actions related to its religious employees and the Mandate violated Title VII. Nonetheless, Defendant forged ahead with its discrimination, recklessly and maliciously disregarding Mr. Turlington's Title VII rights. In other words, Defendant knew it was violating the law but terminated Mr. Turlington anyway.

131.    Further, Defendant's decision to end Mr. Turlington's career based on a workplace safety justification further demonstrates SRNS's reckless disregard of Mr. Turlington's Title VII rights.

132.    As a result of Defendant's unlawful actions, Mr. Turlington has suffered emotional and psychological distress from the loss of his career, loss of promotional opportunities, loss of

pension benefits, salary increases, and the months of uncertainty and repeated coercion to disregard his bona fide religious beliefs in order to preserve his livelihood and career.

133.    As a result of the discriminatory treatment he experienced, he is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; trouble sleeping, stomach issues, and feelings of agitation; and irritability.

134.    As a result of Defendant's unlawful actions, Mr. Turlington has also suffered financial harm including loss of compensation, loss of benefits, loss of salary increases, loss and/or reduced coverage of health insurance, employee assistance program, short, and long-term disability insurance, company matched retirement, and accidental death insurance.

135.    Defendant's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Mr. Turlington's rights under Title VII. As a direct and proximate result of SRNS's discriminatory treatment, Mr. Turlington has suffered, and continues to suffer, economic, pecuniary damages for which he is entitled to judgment.

136.    The foregoing conduct constitutes illegal, and intentional failure to accommodate that is prohibited under 42 USC § 2000e-2 *et seq*.

137.    Mr. Turlington seeks back pay, interest on back pay, the value of back benefits, and front pay all through the date of trial, attorney fees, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and punitive damages.

138.    As a direct and proximate result of the discriminatory treatment, Mr. Turlington has suffered, and continues to suffer, the damages hereinafter described. Accordingly, Mr. Turlington requests relief as hereinafter described.

## COUNT TWO

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.**
**Religious Discrimination – Disparate Treatment**

139.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as fully set forth herein.

140.    Mr. Turlington will also demonstrate a *prima facie* case for religious discrimination under a disparate treatment theory.

141.    A *prima facie* case for disparate treatment requires the plaintiff to show: (1) he is a member of a protected class, (2) satisfactory job performance (3) he suffered an adverse employment action, and (4) by presenting a mosaic of circumstantial evidence that raises an inference of discrimination. *See EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 851 n. 2 (4th Cir. 2001).

142.    As a practicing Christian who notified Defendant of his religious conflict with the Mandate, Mr. Turlington is a member of a protected class.

143.    As demonstrated by his strong performance record, including required travel throughout the pandemic, Mr. Turlington was qualified for his job.

144.    Mr. Turlington suffered adverse employment action when he requested religious accommodation to the Mandate and was denied. He suffered additional adverse action when he was terminated or constructively discharged for non-compliance with the Mandate due to his religious conflict.

145.    The circumstances surrounding the adverse actions taken against Mr. Turlington generate strong inferences of discrimination.

146.    Defendant treated secular employees, with medical conflicts with the Mandate, more favorably than similarly situated employees, religious employees with a religious conflict with the Mandate.

147.    SRNS knew or should have known during the relevant time frames that the mandated vaccines were incapable of preventing infection of COVID-19. Yet, the company terminated Mr. Turlington on provably false rationales, asserting that Mr. Turlington must violate his religious beliefs because workplace safety could only be achieved through vaccination. SRNS also knew that many low-cost and no-cost accommodations were readily available, yet counterfactually claimed the opposite. SRNS also knew its vaccinated employees were contracting COVID-19 at similar or higher rates than unvaccinated religious employees, like Mr. Turlington. Nonetheless, the company counterfactually maintained that Mr. Turlington posed an unacceptable safety risk relative to its secular vaccinated employees, and that his career must, therefore, be ended. In these circumstances, an inference of discrimination is more than plausible.

148.    On belief, SRNS replaced Mr. Turlington with an employee outside the relevant protected class, a vaccinated employee who did not possess religious beliefs in conflict with vaccination, giving rise to further inferences of discrimination.

149.    On belief, SRNS also accommodated unvaccinated employees similarly situated to Mr. Turlington who had significantly more in-person contact than Mr. Turlington, provided those employees sought accommodation for secular medical reasons. This gives rise to additional inferences of unlawful discrimination. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) (holding that Title VII's "disparate-treatment provision prohibits actions taken with the *motive* of avoiding the need for accommodating" religious beliefs) (emphasis in original)).

150. Refusing to accommodate religious beliefs because of their religious nature, but accommodating medical needs, is precisely the type of behavior the Supreme Court recently stated would violate Title VII. The Supreme Court ruled "a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.'" *Groff*, 600 U.S. at 472.

151. On belief, Defendant accommodated secular employees with medical accommodations but denied all religious accommodation requests.

152. Defendant also knew that requiring Mr. Turlington to comply with the Mandate would force him to violate his religious beliefs.

153. Mr. Turlington gladly declined any hypothetical personal protection the COVID-19 vaccines may have provided in order to preserve his religious convictions.

154. For the reasons detailed throughout, any reasons Defendant attempts to justify Mr. Turlington's termination and/or constructive discharge are pretext. Most glaringly, SRNS could have accommodated Mr. Turlington without any undue hardship whatsoever because he would have paid for the cost of regular testing.

155. Furthermore, the publicly available data that the vaccines were incapable of preventing infection or transmission, or at least providing some defined level of protection, further demonstrates Defendant's disingenuous justification for terminating religious employees, like Mr. Turlington. If workplace safety was truly its intention, Defendant would have accepted natural immunity as satisfying the Mandate's requirements (which it did not), would have informed its employees of the significant safety risks associated with the COVID-19 vaccines, and would have required its vaccinated employees, who were contracting COVID-19 at similar or higher rates than unvaccinated religious employees like Mr. Turlington during the relevant time frames, to adhere

to enhanced safety protocols to ensure vaccinated employees did not spread the virus to vulnerable co-workers and to members of the public at large.

156.    In short, considering the foregoing, Mr. Turlington was terminated or constructively discharged "because of" his religious beliefs.

157.    SRNS possessed unlawful motivations to purge the maximum number of employees who possessed religious objections to vaccination as possible, including Mr. Turlington.

158.    The aforementioned conduct is prohibited under Title VII and constitutes a violation of the same.

159.    For the reasons detailed throughout, Defendant recklessly and maliciously disregarded Mr. Turlington's Title VII rights, meriting punitive damages.

160.    In addition to financial loss, Mr. Turlington suffered emotional and psychological harm from the months of uncertainty and repeated coercion to disregard his bona fide religious beliefs in order to preserve his livelihood and career. As a result of the discriminatory treatment he experienced, he is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life, feelings of despondency, social anxiety, trouble sleeping, stomach issues, and feelings of agitation, and irritability.

161.    Mr. Turlington seeks back pay, interest on back pay, loss of salary increases, the value of back benefits, and front pay all through the date of trial, attorney fees, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and punitive damages.

162.    All of the aforementioned damages were actually and proximately caused by Defendant's violation of Title VII.

163.    As a direct and proximate result of the discriminatory treatment, Plaintiff has suffered, and continues to suffer, the damages hereinafter described.

164.    Accordingly, Mr. Turlington requests relief as hereinafter described.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant, awarding relief as follows:

i.    Declare that Defendant discriminated against Mr. Turlington in violation of Title VII for its failure to provide a reasonable accommodation to his sincere religious beliefs when numerous no-cost or low-cost options were available;

ii.    Declare that Defendant violated Title VII by treating religious employees like Mr. Turlington less favorably than similarly situated employees outside the relevant protected class;

iii.    Declare that Defendant recklessly disregarded Mr. Turlington's Title VII rights;

iv.    Require Defendant's supervisors and upper management to undergo training for Title VII regarding their duties to avoid discrimination on the basis of religion, consistent with Title VII's requirements;

v.    Issue a permanent injunction requiring Defendant to expunge Mr. Turlington's personnel files of any derogatory, false, or misleading information relating to this matter;

vi.    Award Mr. Turlington damages, which exceed $100,000.00, including back pay, front pay, loss of salary increases and promotional opportunities, loss of benefits and back benefits, pre-judgment and post-judgment interest, punitive damages, compensatory damages, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

vii.    Award Mr. Turlington damages necessary to make him whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including but not limited to, emotional pain, suffering, inconvenience,

loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at trial;

       viii.    Award Mr. Turlington damages for severe emotional distress that resulted from Defendant's unlawful actions;

       ix.    Award Mr. Turlington reasonable attorneys' fees and costs; and

       x.    Grant any other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and 29 U.S.C. § 626, Plaintiff demands a jury trial on all issues upon which there is a federal right to a jury trial.

RESPECTFULLY SUBMITTED this 2nd day of April, 2025 by:

                                          */s/ Neil P. William*
                                          Neil P. Williams
                                          SC Fed Bar No.: 14401
                                          SIRI & GLIMSTAD LLP
                                          745 Fifth Avenue, Suite 500
                                          New York, NY 10151
                                          Phone: 929-474-6448
                                          Facsimile: 646-417-5967
                                          nwilliams@sirillp.com

                                          Walker D. Moller*
                                          SIRI & GLIMSTAD LLP
                                          1005 Congress Avenue
                                          Suite 925-C36
                                          Austin, TX 78701
                                          Phone: 512-265-5622
                                          Facsimile: 646-417-5967
                                          wmoller@sirillp.com

                                          Jack R. Spitz*
                                          SIRI & GLIMSTAD LLP

8 Campus Drive, Suite 105 PMB#161
Parsippany, New Jersey 07054
Phone: 212-532-1091
Facsimile: 646-417-5967
jspitz@sirillp.com

\* *Pro Hac Vice Motions forthcoming*